**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Aimee Lespron; Stacey Smith,<br><br>    Plaintiffs,<br><br>vs.<br><br>Tutor Time Learning Center, LLC;<br>Learning Care Group, LLC; Michelle<br>Casillas and John Doe Casillas,<br><br>    Defendants. | No. CV 10-01760-PHX-NVW<br><br>**ORDER** |

Before the Court is Defendants' Motion for Summary Judgment (Doc. 39) and Plaintiffs' Motion for Partial Summary Judgment Re: Punitive Damages (Doc. 41). Oral argument was heard on January 17, 2011. Plaintiffs' evidentiary objections to exhibits in Defendants' Separate Statement of Facts (Doc. 40-2) are overruled.

**I.    Background**[1]

Both Plaintiffs worked at Tutor Time Center No. 6090 in Queen Creek, Arizona. Smith began in June 2008, and Aimee Lespron began in December 2008. Smith worked as a lead teacher and Lespron as an after-school teacher. Defendant Michelle Colbert was Plaintiffs' supervisor and the Center Director. Neither Smith nor Lespron ever heard

---

[1]The facts presented here reflect the evidence viewed in the light most favorable to Plaintiffs, and all justifiable inferences from the evidence are drawn in favor of Plaintiffs. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

Colbert make any negative or discriminatory comments about pregnancy or pregnant women. Approximately 32 people work at Center No. 6090.

Both Plaintiffs received notice regarding performance problems. In February 2009, Smith was in a classroom where another teacher pinched a child. The teacher self-reported the incident, and Colbert interviewed Smith regarding the incident shortly thereafter, but Smith did not independently report the incident. On March 16, 2009, Smith received a Note to File regarding attendance problems and was placed on a Performance Improvement Plan. At that time, both Smith and Colbert assigned Smith's performance an overall rating between consistently meets and fails to consistently meet job requirements. On March 27, 2009, she was placed on a second Performance Improvement Plan for allegedly placing her feet on a napping child. In March 2009, Smith told Colbert about her pregnancy a few days after she found out about it. In May 2009, Smith was placed on a third Performance Improvement Plan for attendance. At that time, she also met with Colbert and Assistant Director Annette Hitchcock and received and signed a Final Warning/Commitment Letter, acknowledging that she would be terminated if she missed another day of work.

On March 13, 2009, Lespron received a Note to File regarding attendance problems. On March 16, 2009, Colbert completed Lespron's performance review, which Lespron signed in June 2009. Colbert gave Lespron an overall rating between consistently meets and fails to consistently meet job requirements. On March 24, 2009, Lespron met with Colbert regarding her attendance problems and was placed on a Performance Improvement Plan because of her attendance problems. In May 2009, Lespron received another Performance Improvement Plan, met with Colbert about her attendance, and was placed on a Final Written Warning for her attendance problems. Tutor Time gave these warnings to Lespron before she told anyone about her pregnancy. In late May or early June 2009, Lespron told Hitchcock she was pregnant.

Center No. 6090's enrollment dropped significantly in the summer of 2009, and it had reduced revenues. Colbert held an employee meeting to discuss the reduced enrollment and need to reduce employees' scheduled hours. She asked for volunteers for reduced hours, and a few employees did volunteer to have their hours reduced. Sherri Rust (formerly Sherri Tinson) was pregnant at the time and asked to have her hours reduced in August 2009.

On July 13, 2009, Plaintiffs' supervisor, Michelle Colbert, distributed a memorandum to all staff, informing them they must plan on working every day they were scheduled to work. The letter said that no more than one person per classroom would be approved to be off on their scheduled day. The letter also states:

> I will be interviewing starting tomorrow for teachers that actually want to work everyday and not complain. I am looking for team players! For those of you that have fallen into the "I do not care category" (which are quite a few of you) I will be redoing the schedule and your schedule will reflect your attitude, your attendance and what I think is best for the center and children in your care. And, just a reminder that there is NO TIME OFF IS ALLOWED IN AUGUST PERIOD per the employee handbook. Also, I will be going over the occurrences [*i.e.*, absences] over the next few days and some of you probably will not have to worry about this because you are not going to have a job much longer.

For each two-week pay period from July 2008 through mid-March 2009, when Smith told Tutor Time about her pregnancy, Smith worked the following hours: 72.68, 56.08, 77.93, 72.23, 61.38, 64.17, 75.85, 73.80, 54.12, 71.37, 61.77, 67.0, 26.93, 60.17, 69.05, 54.35, 40.0, and 68.35. For each two-week pay period from mid-March 2009 through early June 2009, after she told Tutor Time about her pregnancy, Smith worked the following hours: 73.57, 66.93, 72.67, 60.62, 68.07, and 61.28. From mid-June through August 2009, she worked the following hours: 43.67, 32.77, 53.43, 58.82, 40.45, and 17.18 hours.

For each two-week pay period from December 2008 through May 2009, when Lespron told Tutor Time about her pregnancy, Lespron worked the following hours: 62.83, 22.92, 68.70, 43.67, 48.93, 65.18, 54.69, 30.05, 42.77, 52.27, 53.12, and 44.53.

- 3 -

For each two-week pay period ending in June 2009, Lespron worked the following hours: 48.95 and 52.23. For each two-week pay period ending in July 2009 through the end of her employment in August 2009, Lespron worked the following hours: 25.65,[2] 35.42, 38.73, 38.33, and 9.57.

In July 2009, Smith told Colbert that it was difficult for her to lift and change diapers of the children in the classes for one- and two-year-olds, so Colbert no longer assigned Smith to work alone in those classes. In August 2009, Smith was placed on "on call" status. She was supposed to be called by 11:00 a.m. each day to be told whether she was needed to work that day. For two weeks after being placed on "on call" status, she did not get any work. On August 28, 2009, Smith was called to work 3:00 p.m. to 6:00 p.m., but she said that she could not work past 5:30 p.m. The same thing happened the following week. Smith was told that if she did not work the hours she was offered, it would be considered job abandonment. Smith's last day of employment was September 16, 2009.

Lespron's last day working at Tutor Time was August 19, 2009. That day, she worked about an hour and a half to two hours when she was sent home because she was not needed. She was scheduled to work 3:00 p.m. to 6:00 p.m. on subsequent days, but she stopped coming in to work because she was "fed up" with her hours. She never talked to Colbert or anyone else in management about why her hours were reduced. She did not tell anyone at Tutor Time that she was not going to show up for work any longer, and no one from Tutor Time called to ask her why she had not come to work.

Between July 23, 2009, and August 4, 2009, Center No. 6090 hired six new employees.

---

[2] Lespon took several days off in July 2009 because her daughter had surgery and was in the hospital.

On August 18, 2010, Plaintiffs initiated this lawsuit. Plaintiffs claim they were injured by Defendants reducing their scheduled work hours. Their complaint alleged four counts: (1) violation of Title VII of the Civil Rights Acts of 1964, as amended ("Title VII") and the Arizona Civil Rights Act ("ACRA") by disparate treatment; (2) violation of Title VII and ACRA by a hostile work environment; (3) intentional infliction of emotional distress; and (4) negligent supervision. On September 15, 2011, the second and third counts were dismissed upon stipulation of the parties.

**II.     Legal Standard**

Summary judgment shall be granted if the evidence shows there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party must produce evidence and show there is no genuine issue of material fact. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To defeat a motion for summary judgment, the nonmoving party must show that there are genuine issues of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A material fact is one that might affect the outcome of the suit under the governing law. *Id.* at 248. A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The nonmoving party must produce evidence to support its claim or defense by more than simply showing "there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The Court must view this evidence in the light most favorable to the nonmoving party, must not assess its credibility, and must draw all justifiable inferences from it in favor of the nonmoving party. *Anderson*, 477 U.S. at 255. Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue of material fact for trial. *Matsushita*, 475 U.S. at 586.

**III. Analysis**

    **A. Disparate Treatment**

Plaintiffs concede they cannot assert a pregnancy discrimination claim against Michelle and Gregory Colbert because there is no individual liability under Title VII. Although not plainly identified in the Complaint, Plaintiffs' Title VII claim for pregnancy discrimination is directed only against Tutor Time Learning Center, L.L.C.

        **1. Burden of Proof**

The United States Supreme Court has set forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.
>
> The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. . . .
>
> The burden of establishing a prima facie case of disparate treatment is not onerous. The plaintiff must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination. . . . Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. . . .
>
> The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity.

*Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-55 (1981) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and other cases; internal quotation marks, citations, and footnotes omitted). This burden-shifting framework applies to federal and state employment discrimination claims both at trial and on summary judgment. *See Dawson v. Entek Int'l*, 630 F.3d 928, 935 (9th Cir. 2011); *Hawn v. Exec. Jet Mgmt.*, 615 F.3d 1151, 1155 (9th Cir. 2010).

### 2. Plaintiffs Have Not Established a Prima Facie Case of Discrimination Based on Pregnancy.

Title VII prohibits employers from discriminating because of an individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). Title VII's definition of discrimination based onسex includes pregnancy. 42 U.S.C. § 2000e(k). The ACRA includes similar prohibitions. *See* A.R.S. § 41-1463(B).

To establish a prima facie case of intentional discrimination, Plaintiffs must show: (1) they were members of a protected class; (2) they were performing their jobs satisfactorily; (3) they experienced adverse employment actions; and (4) similarly situated individuals outside their protected class were treated more favorably. *Hawn*, 615 F.3d at 1156. Because the ACRA is modeled after Title VII, federal case law is persuasive in applying the ACRA. *Francini v. Phoenix Newspapers, Inc.*, 188 Ariz. 576, 582, 937 P.2d 1382, 1388 (Ct. App. 1996).

Plaintiffs have shown that they were members of a protected class, *i.e.*, pregnant, and they experienced adverse employment actions, *i.e.*, reduction in scheduled work hours. On this record, whether either Plaintiff was performing her job satisfactorily is questionable. It is undisputed each received multiple notices regarding attendance problems, yet neither was terminated for cause.

But Plaintiffs have not produced any evidence that similarly situated individuals outside their protected class were treated more favorably. They contend they are required to show only that pregnant employees' scheduled hours were reduced and non-pregnant

- 7 -

employees' scheduled hours were not. Generally, however, "individuals are similarly situated when they have similar jobs and display similar conduct." *Hawn v. Executive Jet Mgmt., Inc.*, 615 F.3d 1151, 1157 (9th Cir. 2010) (quoting *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003) (employees who did not engage in problematic conduct of comparable seriousness were not similarly situated)). To be similarly situated, employees must be similar in all material respects, a determination that requires fact-intensive inquiry. *Id.* "[W]hat facts are material will vary depending on the case." *Id.* Here, whether employees consistently show up for work when scheduled is material. Thus, to establish a prima facie case of intentional discrimination, Plaintiffs must show that non-pregnant employees with attendance problems were treated more favorably, and they have not. Although Plaintiffs contend that Defendants have produced no records of any other employees' attendance, Plaintiffs have not alleged that they unsuccessfully sought discovery of attendance records, and they bear the burden of production on this point.

      Even if Plaintiffs were only required to show disparate treatment between pregnant and non-pregnant employees, their evidence does not support their conclusions. They correctly state that for the pay period ending August 28, 2009, the only employees who worked less than 20 hours were Plaintiffs, but that is the only pay period in which they worked less than 20 hours, and it is the period during which they were unable or unwilling to work the hours offered to them. Moreover, the trend of hours each Plaintiff worked did not abruptly drop after she told Tutor Time about her pregnancy. The record does not show a noticeable reduction in hours worked until June 2009 for Smith and July 2009 for Lespron.

      Plaintiffs also contend that Colbert's July 13, 2009 letter to staff indicates many people had attendance problems, but not everyone's hours were reduced. However, the letter actually says "all" of them were "out of control with wanting to trade shifts, leave early and wanting the same days off." Regarding attendance, the letter indicates that

Colbert intended to review attendance records and "some" of them were likely to lose their jobs as a result.

Thus, Plaintiffs have not shown a prima facie case of discrimination because the evidence does not show that any non-pregnant employees with attendance problems did not have their scheduled work hours reduced.

        **3.      Even If Plaintiffs Had Shown a Prima Facie Case of Discrimination, They Have Not Created a Genuine Issue of Material Fact Regarding Whether Defendants' Non-Discriminatory Reasons for Their Actions Are Pretextual.**

Defendants contend they reduced Plaintiffs' scheduled work hours because of reduced enrollment and Plaintiffs' attendance problems. In addition, they chose not to place Smith in certain classrooms because of an incident between another teacher and a child and because Smith asked not to be scheduled in classes where she would need to pick up children for diaper changing, which reduced options for scheduling her to work. They also explained that they hired new employees because they were needed to fill specific positions inappropriate for Plaintiffs. Plaintiffs concede that there is no evidence of pregnancy discrimination other than the reduction of scheduled work hours. Thus, even if Plaintiffs had made a prima facie case of discrimination, Defendants have presented legitimate nondiscriminatory reasons for reducing Plaintiffs' hours that would be sufficient to rebut a presumption of discrimination.

Plaintiffs contend that they have shown a genuine issue of material fact regarding whether Defendants' justifications for reducing Plaintiffs' scheduled work hours are mere pretext by showing that Defendants have stated different reasons for their actions: decreased enrollment, need to exclude Smith from certain classrooms, and Plaintiffs' poor attendance. However, these reasons are not inconsistent with each other. Further, Plaintiffs' poor attendance documented well before Plaintiffs claimed pregnancy discrimination cannot be disregarded as post hoc justification created by lawyers, as Plaintiffs contend. Moreover, Colbert announced in her July 13, 2009 memorandum to

staff her intention to hire new employees and that employees would be scheduled hours based on their attitude and attendance. Thus, Plaintiffs have not created a genuine issue of material fact regarding whether Defendants' reasons for reducing Plaintiffs' hours are pretext.

**B.  Negligent Supervision**

In their Complaint, Plaintiffs allege "Defendants owed them a duty to supervise their employees in a reasonable, non-negligent manner" and "Defendants breached this duty by . . . allowing its employees to . . . engage in a persistent pattern of conduct in violation of the law and the public policy of this state." Because summary judgment will be granted in Defendants' favor on Plaintiffs' discrimination claim, there is no evidence showing negligent supervision by permitting discrimination.

Further, there is no Arizona common law duty for employers to comply with Title VII and ACRA. Plaintiffs may not create a common law negligence cause of action to hold individuals liable for statutory violations.

**C.  Punitive Damages**

Based on the foregoing determinations, Plaintiffs' Motion for Partial Summary Judgment Re: Punitive Damages is moot.

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (Doc. 39) is granted and Plaintiffs' Motion for Partial Summary Judgment Re: Punitive Damages (Doc. 41) is denied as moot.

IT IS FURTHER ORDERED that the Clerk enter judgment in favor of Defendants and against Plaintiffs and that Plaintiffs take nothing. The Clerk shall terminate this case.

DATED this 18th day of January, 2012.

_____
Neil V. Wake
United States District Judge